Jane McF. Miller, Appellant, v. R. R. Nesbitt et al., Appellees.

CONTRACTS: Rescission—Effect. A defendant who is tendered in court his promissory note, in rescission of the transaction out of which the note arose, and accepts said note, may not defend against a claim based on the original transaction. In other words, defendant cannot, by accepting the offered rescission, defeat rescission and also escape all liability.

Headnote 1:  12 C. J. pp. 344, 345 (Anno.).

Headnote 1:  24 A. L. R. 253; 6 R. C. L. 942.

*Appeal from Polk District Court.*—Joseph E. Meyer, Judge.

March 15, 1927.

Rehearing Denied November 15, 1927.

Suit in equity to establish a trust and for an accounting.

From a general decree in favor of the defendants plaintiff appeals.—*Modified and affirmed*.

*Andrew L. Chezem*, for appellant.

*Franklin Brown, A. B. Schuetz, P. W. Walters*, and *R. R. Nesbitt*, for appellees.

ALBERT, J.—This action was against R. R. Nesbitt and his wife, Faye Nesbitt. After the plaintiff rested her case, the court, on motion, dismissed the action against the wife. This ruling was correct, because there was no evidence whatever in the record that would warrant a decree against the wife, Faye Nesbitt.

To us, this case is an anomaly. Some facts are conceded, among which are: That, from the year 1917, R. R. Nesbitt and C. N. Johnston were lawyers engaged in the practice of law in the city of Des Moines; that appellant, Jane McF. Miller, and her husband, Charles B. Miller, were interested in the estate of Abby A. Miller, deceased, and this firm of attorneys was employed by appellant and her husband to look after their interest in the estate. Appellant herein had a claim against that estate, which the attorneys succeeded in having allowed, in the sum of $3,200. On July 1, 1918, this money was turned over to the Millers. Miller and his wife kept their funds in a common account in a bank, and about two years later, $2,000 of this common bank account passed from the Millers to Johnston, a member of the above firm. It was invested in 80 shares of stock of the Bond & Mortgage Company of Iowa, and a joint note was made to the Millers for this amount, signed in the individual names of Johnston and Nesbitt. Nesbitt denies that he ever signed or authorized his name to be signed to that note. Later, on July 12, 1921, this $2,000 note was taken up, and Nesbitt and Johnston each gave to the Millers his individual note for $1,000. It is Nesbitt's claim that this deal with the Millers was carried on between the Millers and Johnston, his partner, without his (Nesbitt's) knowledge. When the 80 shares of stock in the Bond & Mortgage Company were bought, 40 of them were taken over by Nesbitt, and he says that it is because of this that he issued his individual note for $1,000 above referred to. This

note not being paid, action was commenced, in May, 1925, against Nesbitt. The petition filed alleges, in substance, the foregoing facts. It alleges that there was a confidential relation between the Millers and this firm of attorneys, and also a family relationship between the Millers and Nesbitt (it appears that a niece of the Millers' was married to Nesbitt's brother); that Nesbitt and Johnston applied to appellant to let them have her money to invest in the Bond & Mortgage Company, saying that they would guarantee a return of 8 per cent thereon, and would see to it that it was safely invested; that the Bond & Mortgage Company and Nesbitt and Johnston were all then and there insolvent, and that said representations were made solely for the purpose of defrauding the appellant; that appellant and her husband let the defendant Nesbitt and his associate Johnston have $1,000 each; that they were told by Johnston and Nesbitt that the money was safely invested in good safe first mortgages, and that they would look after said investment; that all of said propositions and representations were false; that the money was wrongfully embezzled and appropriated and converted by Nesbitt to his own use; that the said note was renewed, and appellant now surrenders into court and tenders back said note, and demands of the appellees the return of her money, in the sum of $1,000, with interest, and damages; that said note is now worthless, and she now surrenders it into court for cancellation. Appellant offered to rescind, and all things to do equity. She prays that appellees be held to be trustees, holding the money of appellant in trust, and that they be required to account therefor; that the court decree that said money was secured by Nesbitt through wrong and fraud; and that title did not pass, and to impress the same upon any and all property held by him, to the extent of $1,800. She prays that an accounting be taken of the money due her, and that the same be ordered returned forthwith, and for damages sufficient to cover attorney's fees.

By an amendment, she adds an alternative prayer, in which she asks for an accounting of the amount of stock purchased in the Bond & Mortgage Company and the income therefrom, and that the court impress a lien of the trust thereon in the hands of Nesbitt; and, in lieu of the promissory note, that she have judgment for $1,000; and that Nesbitt be ordered to surrender

and account for the income on said stock, together with such 40 shares of stock in said Bond & Mortgage Company; and that the same be sold, and the proceeds, together with such income, applied upon said judgment.

Appellees answered in three divisions: First, a general denial; second, that appellees accepted the tender back of the promissory note referred to in appellant's petition, and accepted the surrender and cancellation of the same; third, that the cause of action, if any, set out in appellant's petition, is barred by the statute of limitations.

At this point, it might be well to stop and consider just what the status of these parties is. It is apparent that the thought of appellant in her petition was that she would waive any rights she had under the note, and turn the same in for cancellation, and would seek to hold Nesbitt for the full $2,000 claim. When appellant sought to recover on the original transaction, and tendered the thousand-dollar note into court, this amounted to an offer of rescission; and appellees cannot accept said note and then defend against a claim based on the original transaction. In other words, if appellees elected to receive the note and cancel it, they must take it under the circumstances and conditions under which it is offered, and the status quo must be restored. This was not done in the case at bar, because, by accepting the return of the note, appellees cannot expect to both defeat rescission and to escape all liability. The appellees must accept the tendered rescission in toto or reject it, and if they accept it, they accept all the conditions attached to it, and are liable on rescission for the money received by them, with interest. But more of this question anon.

We have stated the high points in the petition, and, if we are able to read it aright, appellant claims that this $2,000 was a trust fund in the hands of Nesbitt & Johnston, and the prayer is that they now be called into court to account, as trustees. This leads us to the real question in dispute here, on which this case must turn: that is, under what circumstances, conditions, and agreements did this fund pass from the hands of the Millers? The appellant, Jane McF. Miller, had little to do with the transaction. She left the matter wholly in the hands of her husband, Charles B. Miller, who forwarded the money to this firm; and at this point the trouble arises. Nesbitt claims that

it was a loan, pure and simple. The Millers claim that the money was turned over to Nesbitt & Johnston, as their agents, to invest for them, under an understanding that whatever investments were made, Nesbitt & Johnston would guarantee the same to the Millers. The Millers left Des Moines for the state of Washington, before this transaction, and whatever agreements were made were by correspondence. Unfortunately, the letters which outline the circumstances under which this money was sent were lost, at the time of the trial. It is undisputed that this correspondence took place, but the only light we have on its contents is the recollection of Miller, and some letters that passed between the parties after the money was received here. Mrs. Miller's testimony is simply her recollection of what her husband told her about it. It appears that, sometime previously, some circulars or advertising matter had been sent to the Millers, with reference to this Bond & Mortgage Company, and it is claimed on the part of appellant that she was induced to forward this money by reason of this advertising. With reference to this matter, it may be said that there is very little, if anything, in said circular which could be made the basis of false representations or fraud. With reference thereto, Mrs. Miller testifies:

"I was not influenced in my mind by it a bit. I left that for Mr. Miller to decide."

Hence, whatever case appellant has made herein must lie largely, if not wholly, upon the testimony of the husband. This testimony we cannot set out in full, but can only summarize the same.

He relates his age as 74 years; gives the history of the interest that he and his wife had in the Miller estate, and that Nesbitt & Johnston were the attorneys who helped them settle with said estate. There seems to have been some little friction between Miller and the attorneys in the final settlement. He testifies as to having bought paper from this Bond & Mortgage Company prior to the time of the transaction in controversy; that he was in Washington, and sent $2,000 in response to a letter from the lawyers, and received a $2,000 note therefor, which note he held for a couple of years, and that:

"Mr. Nesbitt and Mr. Johnston, I don't know for what reason, wanted me to release the $2,000 note, and take their

personal notes for $1,000 each. Just to free them from any liability, I suppose. That is what I did."

He further testifies that this $2,000 note was turned over, and that Johnston and Nesbitt were together in the office, and each executed his note for $1,000.

"I didn't buy any shares of the Bond & Mortgage Company, nor did I buy any for my wife: she did not instruct me to buy any. I would not have let Nesbitt & Johnston have the $2,000 if I had not had faith in them. I trusted them as my attorneys. I had let them have a good deal of my money to invest, besides my wife's money. This $2,000 note and these securities were put up to you [me] for collateral to secure you [me] against any loss in investment made. He [Nesbitt] told me he invested it in good securities. He said it was safe. Besides, he would stand personally liable for any investments he made for me. He didn't make that statement to me before I sent him the $2,000 from Washington, but after that. My understanding was, when I sent it to him, that he would invest it in bonds."

He further testified that he wrote Nesbitt about the matter several times afterwards, and sometimes got no reply. He introduced a letter purporting to be from Nesbitt, under date January 24, 1923, in which is contained the following:

"I have your letter of January 22d and am somewhat surprised at the contents. You no doubt know that any money you have in the Bond & Mortgage Company or in their notes, was placed there by yourself against my advice and best judgment. The only money of yours that I used, and on which I lost the money which was being used for you, I gave you a note to cover the amount."

The letter then proceeds with statements that Nesbitt was making efforts to dispose of his stock in certain companies, and that he expected to take care of the indebtedness due the Millers. Another letter, under date June 14, 1923, written by Nesbitt and addressed to Miller, is devoted principally to a recitation of the hard times and bad financial condition of Nesbitt, and a suggestion that he might pay on monthly installments. Several other letters are introduced, the substance of which is similar to the last one; also some correspondence between Nesbitt and the attorney for appellant. One or two small payments were made

on this note in the intermediate time.    On cross-examination, this witness says that he went to Washington in April, 1918, and the $2,000 "loan" had not been taken up before he went; that all the dealings about it were by correspondence; that there was no oral conversation with Nesbitt about the deal before it was made.    He testified:

"I mailed the draft to Des Moines, to Nesbitt & Johnston. I understood Mr. Nesbitt was attorney for the Bond & Mortgage Company and Mr. Johnston was its president. Came back from Washington in March, 1919. He wrote me what it would be invested in when he wrote for the money. He said it would be invested in the Bond & Mortgage Company of Iowa, and in this note Nesbitt stated that any investments he made for me he would stand good for himself, personally, no difference whether he lost it or not. That was what he told me. He didn't write that; he told me that verbally. That was the understanding when he wrote they would invest that in stock of the Bond & Mortgage Company of Iowa. That is why I let them have the money,—not particularly with reference to this $2,000,—that was all provided for in the investment he made in the first place. Nesbitt wrote me that the $2,000 was invested in stock of the Bond & Mortgage Company of Iowa. I bought other notes from the Bond & Mortgage Company through Mr. Johnston. Yes, they told me in their letter and circular that they would invest this money for me in good securities, when they got it, and I took it for granted they would invest it as stated in their circular [Bond & Mortgage Company's circular], and that was what I relied upon. In their letter they stated, they would invest it in stock of the Bond & Mortgage Company of Iowa. Q. Did they get it to invest for you? A. No, no; they got it to invest for themselves, as I understood it. Q. What security were you to have? A. I was to have their notes. I meant it was to be invested in good securities. I was to get the income from the securities."

Jane McF. Miller testifies:

"I read the letter [the lost letter]. It asked Mr. Miller if he had the money yet, and if so, would he send them a couple of thousand dollars, for the purpose of investing in bonds and mortgages? He sent the money to them the next day after he received the letter. I knew of my husband's having a con-

versation with Mr. Nesbitt before we went west, with reference to the investment of our money in mortgages and bonds through the Bond & Mortgage Company that was going to be organized. I never heard them talk, but he came home and told me he thought it was going to be a good thing. I never at any time authorized him to take stock in the Bond & Mortgage Company or told him to buy that. At the time Mr. Miller sent the money, I understood it was the Bond & Mortgage Company that he was going to invest in for us. I understood he was to invest in the Bond & Mortgage Company, and Loan, or whatever it is. Mr. Nesbitt wanted the money to invest. That is what he wrote.''

Nesbitt, who was called as a witness in behalf of appellant, testifies that he never saw the draft or received the money sent by Miller; that Johnston handled the matter, and that he (Nesbitt) has not the money now, and never did have it; that he discovered, some considerable time after the transaction, that Johnston had used the money to buy 80 shares of stock in the Bond & Mortgage Company, and later he turned over 40 shares to Nesbitt.

Nesbitt, called on behalf of appellee, testifies that, at the time the correspondence took place between his office and the Millers, while they were in Washington, he (Nesbitt) was not in Des Moines, and that he knew nothing about the transaction until several months thereafter. He says that, when he discovered same, he took the matter up with Johnston, and Johnston told him that Miller had loaned him this money, and that, in his conversation with Miller thereafter, Miller referred to it as a ''loan,'' and in no other way; that, in the transfer of the 40 shares of stock by Johnston to Nesbitt, Nesbitt assumed one half of the liability, and he offers to turn these 40 shares of stock back to Miller, or anyone to whom the court finds them entitled.

On cross-examination, the whereabouts of this stock was inquired into, and on request of counsel for appellant, the certificates were brought into court. As shown by the books of the corporation, 40 shares were in the name of Johnston, and 40 shares in the name of Miller. Nesbitt further says:

''I assumed my part of the responsibility, when the 40 shares of stock were turned over to me. I adopted the transaction, in so far as assuming my part of the liability. When I

discovered that the note was signed by me, instead of Johnston alone, I asked them to divide the liability on the note, and they accepted the $1,000 note from me. I had not discovered that my name was on the $2,000 note, before this. To the best of my knowledge, the Bond & Mortgage Company of Iowa has, above its liabilities, somewhere between $25,000 and $30,000 of assets. Some of them are city mortgages. They have about 13 acres of land in Des Moines, adjoining Valley Junction. They have a trust deed of 160 acres of land. I don't know their interest in that. They have $30,000 of the Gibford notes, that must have some value in them. I don't know what their value would be. I saw a check of their available assets two weeks ago, —somewhere between $25,000 and $40,000. I was connected with that same Bond & Mortgage Company in 1925. At that time, I had the same stock I now have. I wrote Miller: 'If you want the stock in the various companies where I lost $15,300 cold cash alone, you can have it. I don't consider it worth a cent.' There is no receiver for this corporation at the present time, but there probably will be. I put an estimate of probably $45,000 above its debts. I don't know whether the stock of the Bond & Mortgage Company could be sold on the market. Some has been sold. I figured that I owed Charles Miller on that note, and that it was money that Johnston had borrowed, on which I had assumed one-half payment. I expected to pay it, and would have paid it, if he had not filed this suit he did, which in every particular is false and untrue.''

At this point the 40 shares of stock held by Nesbitt, in response to the request of counsel, were brought into court and tendered.

One other piece of testimony that throws light on this question is that of appellant, in which she says that, shortly after advancing this money, they received what is designated in the record as Exhibit B, which reads as follows:

''Des Moines, Iowa, July 12, 1918. As security for a loan of $2,000 made by Jane McF. Miller to R. R. Nesbitt and C. H. Johnston, as of even date hereof, it is agreed that the said $2,000 shall be used for the purchase of eighty shares of stock in the Bond and Mortgage Company of Iowa, a corporation with its principal offices at Des Moines, Iowa, and for no other purpose; that the said stock shall be held by the Bond and

Mortgage Company of Iowa from the time of its issue, subject to the instructions of the said Jane McF. Miller to be forwarded to her or to any bank she may designate, and said stock shall be held as security for said note from the date of its issuance, said note being due one year from date hereof, and drawing interest at the rate of eight per cent per annum, payable semi-annually.

'' [Signed] R. R. Nesbitt. .

'' [Signed] C. H. Johnston.

"Accepted by the Bond and Mortgage Company of Iowa as evidence of the actual ownership of above mentioned stock, when issued, being in Jane McF. Miller. The Bond and Mortgage Company of Iowa. By [Signed] C. H. Johnston, President.''

The burden of proof was on appellant herein to establish, by a preponderance of the evidence, her contention as to the circumstances under which this money was released by appellant. To put it more simply, appellant claims that the money was furnished to be invested in good securities, that were to be guaranteed by Johnston and Nesbitt. Nesbitt claims that it was an out-and-out loan of $2,000, negotiated, in the first instance, by Johnston, without the knowledge of Nesbitt, and that Nesbitt afterward participated. therein, and assumed liability for one half of it.

The evidence in the case 'does not warrant a finding that appellant has sustained the burden of proof placed upon her in a case of this kind. More than this, whatever may have been the original transaction between these parties, a point was reached where the joint liability on the original $2,000 note was eliminated, and the Millers accepted the individual $1,000 notes of Johnston and Nesbitt in place thereof. There is no claim whatever that this $1,000 note was procured by fraud, false representation, deceit, or any other ground which equity would hold to be sufficient to declare the note void. By the acceptance of this $1,000 note, without any reference whatever to the stock of the company which was purchased by the original $2,000, it is apparent that the Millers accepted these thousand-dollar notes in full adjustment of the matters between them; and, having so done, in our opinion they cannot reopen and re-

investigate the preceding matters which were foreclosed by their acceptance of the individual $1,000 notes from Johnston and Nesbitt.

Appellant filed a motion for a new trial,—a rather unusual proceeding in an equity case,—and in one of the grounds thereof she alleges newly discovered evidence, which consists of the original letter which was referred to in the record as having been lost. The material part of this letter is as follows:

"July 12, 1918. With regard to the loan to Mr. Johnston and I, we will be glad to use $2,000 at eight per cent, to be used for and secured by the issuance of a like amount of stock in the Bond & Mortgage Company of Iowa. I have prepared a note and collateral contract, which I have had Mr. Johnston accept and record in the company's records. As soon as we receive the money, the stock can be issued, and if you will advise us what you wish done with it, or where you wish the certificates sent, we will comply. * * * You may send the money to me, or make it payable to the Valley National Bank, trustee, or direct to the Bond & Mortgage Company, as you choose."

Just where this letter would be of assistance in appellant's case we are unable to determine. This, taken in connection with Exhibit B, hereinbefore set out, confirms the contention of appellee Nesbitt that the $2,000 originally was a direct loan to Nesbitt and Johnston, secured by the 80 shares of stock of the Bond & Mortgage Company. This could in no way help appellant in the kind of an action she has here brought. In other words, it negatives her whole cause of action, as set out by her in her pleadings. In the prayer of appellant she asks for alternative relief, and among other things, that she have judgment against Nesbitt for the thousand dollars, with 8 per cent interest from July 12, 1921, and for such other and further relief in the premises as equity may require, and as shall appear meet and just, with her costs, etc.

Since we hold, as heretofore stated, that she was not entitled to rescind, and that her plea of a trusteeship was not available to her, under the record, there is no question but that Nesbitt is liable on the thousand-dollar note, with interest, and we know of no reason why such judgment should not be entered against him. The original judgment herein entered by the district court will be modified to this extent, and judgment may, if

desired, be entered in this court accordingly.—*Modified and affirmed.*

EVANS, C. J., and DE GRAFF and MORLING, JJ., concur.